# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NUTEX MANUFACTURING COMPANY, L.L.C.**, 717 St. Nicholas Avenue, Brewton, Alabama 36427, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>**AAA COOPER TRANSPORTATION; ARKANSAS BEST CORPORATION; ABF FREIGHT SYSTEMS, INC.; AVERITT EXPRESS, INC.; CON-WAY FREIGHT, INC.; ESTES EXPRESS LINES, INC.; FEDEX CORPORATION; FEDEX FREIGHT CORPORATION; FEDEX NATIONAL LTL, INC.; JEVIC TRANSPORTATION, INC.; OLD DOMINION FREIGHT LINE, INC.; OVERNITE CORPORATION; ROADWAY EXPRESS, INC.; R+L CARRIERS, INC.; SAIA, INC.; SAIA MOTOR FREIGHT LINE, LLC; SOUTHEASTERN FREIGHT LINES, INC.; SUN CAPITAL PARTNERS IV, LLC; UNITED PARCEL SERVICE, INC.; WATKINS MOTOR LINES; YELLOW TRANSPORTATION, INC.; YRC REGIONAL TRANSPORTATION, INC.; and YRC WORLDWIDE, INC.,**<br><br>        Defendants. | Civil Action No. _____<br><br><br><br>CLASS ACTION COMPLAINT<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, NuTex Manufacturing Company, L.L.C., brings this action for damages and injunctive relief for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the antitrust laws of the United States against all the national and the dominant regional trucking freight carrier conglomerates named above, which are or were operating in the market known as "less-than-truckload" or "LTL" freight transportation services in the United States

between at least June 15, 2003 and the present. Based upon personal knowledge, information and belief and the investigation of counsel, Plaintiff NuTex Manufacturing Company, L.L.C. alleges as follows:

## NATURE OF THE ACTION

1.      This case arises out of conspiracy among defendants and their coconspirators to fix the prices of "fuel surcharges" applied to less-than-truckload freight shipments ("LTL").

2.      This case is brought as a class action on behalf of all persons who, from at least as early as June 15, 2003 to the present (hereinafter, the "Class Period"), purchased LTL freight transportation services and were assessed and paid a "fuel surcharge" directly to one or more of the defendants or their co-conspirators ("LTL Fuel Surcharges").

3.      During the Class Period, and possibly earlier, defendants conspired to fix, raise, maintain and/or stabilize prices of LTL Fuel Surcharges by the means and mechanisms described herein, which, by their character, their arbitrary nature and sheer volume of acts taken against the interest of each individual defendant, could only be the result of collusive conduct.

4.      As alleged herein, defendants agreed with each other to charge LTL Fuel Surcharges to customers; to compute and apply them in a common manner; to set and compute them as percentages of their customers' base freight rates using common indices so that any increases were not reflective of the actual fuel price increases; to use common trigger points in near lockstep fashion; to maintain near total uniformity of the percentages charged; to portray the surcharges to customers as necessary to recoup unexpected fuel cost increases when they were not; to use the surcharges instead as revenue generators; and to maintain an appearance of competing on LTL freight shipment rates, while using LTL Fuel Surcharges as revenue-enhancement measures shielded from normal competitive forces.

5.      Defendants' choice of a common index, common trigger points for adjustment, and a common methodology of percentages of base rates, enabling uniformity of charges and insuring that the LTL Fuel Surcharges would not correlate to any actual increase in the cost of fuel, are all evidence of the fact that defendants' LTL Fuel Surcharge programs were the result of concerted, rather than unilateral conduct.

6.      It was not in the unilateral economic self-interest of each defendant to agree on a common index, trigger points and methodology for LTL Fuel Surcharges or on the amount and timing of LTL Fuel Surcharges instead of seeking to increase its business and market share by implementing a different and lower LTL Fuel Surcharge or methodology than its competitors.

7.      Each of the acts described in paragraphs 4 and 5 above, both individually and taken in combination, constitute acts by each defendant against its own interest, as well as collusive conduct. Each act resulted in inflated LTL Fuel Surcharges charged to its customers, in amounts greater than the actual cost of fuel increases, imposed on commodity services where purchasers made purchasing decisions based primarily, if not wholly, on price. Had any defendant *not committed* any one or all of these acts, it would have resulted in increased market share, increased profits to the company and increased value to the shareholders – obtained by lawful means.

8.      As one industry analyst observed, "despite different LTL carriers having very different operational characteristics and economies, they invariably set nearly identical fuel surcharge levels."

9.      When defendant FedEx Freight finally announced a 25% reduction of its LTL Fuel Surcharges on July 23, 2007, Bear Stearns' analyst noted that the LTL Fuel Surcharge reduction was "the most overt sign of price competition in the LTL market since the mid 1990s."

10.     By 2005, defendants' concerted LTL Fuel Surcharge programs were enabling them to obtain record profits and profit margins. For example, Old Dominion achieved the highest profit margins in its 14 years as a public company.

11.     As a direct and proximate result of defendants' unlawful conduct and price-fixing conspiracy, plaintiff and the members of the Class (defined below) have paid unlawful, artificially high prices for LTL Fuel Surcharges, and thus unlawful, artificially high prices for LTL freight transportation services than they would have paid in a competitive market, and therefore, have suffered injury to their respective businesses and property.

12.     At all times relevant to this Complaint, plaintiff has been a direct purchaser of LTL Fuel Surcharges from one or more of the defendants. Plaintiff brings this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

## PLAINTIFF

13.     Plaintiff NuTex Manufacturing Company, L.L.C. ("NuTex" or "Plaintiff") is a Alabama limited liability corporation with its principal place of business located at 717 St. Nicholas Avenue, Brewton, Alabama 36427. During the Class Period, NuTex purchased LTL freight transportation services directly from one or more of the defendants and was assessed and paid LTL Fuel Surcharges in connection with the LTL freight transportation services.

14.     The prices NuTex paid to defendants for LTL freight transportation services on which LTL Fuel Surcharges were imposed was greater than the prices NuTex would have paid absent the conspiracy alleged herein. NuTex has therefore been injured in its business and

4

property by reason of defendants' antitrust violations. NuTex asserts its claims on behalf of itself and all direct purchasers who, during the Class Period, purchased from one or more of the defendants LTL freight transportation services which resulted in an imposition of LTL Fuel Surcharges.

## DEFENDANTS

### The YRC Defendants

15.     Defendant YRC Worldwide, Inc. ("YRC") (formerly named Yellow Corporation, Yellow Freight System, Inc. of Delaware and Yellow Roadway Corporation) is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211-1213. The YRC group of companies is the largest LTL freight transportation services provider in the United States and one of the largest in the world. YRC operates in the LTL market through its wholly-owned operating subsidiaries Yellow Transportation, Inc., Roadway Express, Inc. and YRC Regional Transportation Inc. During the Class Period, YRC directly and/or through its control of its affiliates sold LTL freight transportation services throughout the United States. According to SJ Consulting Group, Inc, experts in the transportation and logistics industries, the YRC conglomerate of companies had annual revenues from its LTL businesses in excess of $8.4 billion in 2006.

16.     Defendant Yellow Transportation, Inc. is an Indiana corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211 and additional offices located at 1 N. Capital Avenue and 36 S. Pennsylvania Street, Suite 70, Indianapolis, Indiana 46204. Yellow Transportation is the wholly owned subsidiary of defendant YRC Worldwide, Inc. During the Class Period, Yellow Transportation directly sold LTL freight transportation

services throughout the United States. In 2006, Yellow Transportation had annual revenues from its LTL business of over $3 billion.

17.     Defendant Roadway Express, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211. Roadway Express is a wholly owned subsidiary of defendant YRC. During the Class Period, Roadway Express directly sold LTL freight transportation services throughout the United States. In 2006, Roadway Express had annual revenues from its LTL business of over $3 billion.

18.     Defendant YRC Regional Transportation, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211. YRC Regional Transportation is a wholly-owned subsidiary of defendant YRC. During the Class Period, YRC Regional Transportation, commonly known as the "YRC Regionals," directly sold LTL freight transportation services throughout the United States. This YRC group had revenues in 2006 in excess of $2 billion.

**The FedEx Defendants**

19.     Defendant FedEx Corporation ("FedEx") is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120. FedEx is an internationally recognized company providing transportation, packaging, shipping, LTL freight transportation services, e-commerce and business solutions. The FedEx group of companies is believed to be the second largest provider of LTL freight transportation services in the United States. According to FedEx's website, its wholly-owned subsidiary FedEx Freight Corporation is a leading U.S. provider of regional next-day LTL service and had annual revenues of $4.5 billion in fiscal year 2007. In September 2006, FedEx purchased the LTL operations of defendant Watkins Motor Lines, bringing its total annual LTL revenue to over $5.4 billion.

During the Class Period, FedEx directly and/or through its control of its affiliates, including

without limitation to its wholly-owned subsidiary FedEx Freight Corporation, FedEx National

LTL and Watkins Motor Lines, sold LTL freight transportation services throughout the United

States.

20.     Defendant FedEx Freight Corporation is a Delaware corporation with its

headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120. FedEx

Freight Corporation is a wholly-owned subsidiary of defendant FedEx and provides (as alleged

in the preceding paragraph) LTL freight transportation services throughout the United States.

During the Class Period, FedEx Freight Corporation directly and/or through or under the control

of its affiliates sold LTL freight transportation services throughout the United States.

21.     Defendants FedEx National LTL, Inc. is a Delaware corporation with its

headquarters located at 1715 Aaron Brenner Drive, Suite 600, Memphis, Tennessee 38120.

FedEx National LTL is a wholly owned subsidiary of defendant FedEx and known as its LTL

division. Defendant Watkins Motor Lines was "rebranded" as FedEx National LTL after its

purchase by FedEx in September 2006. During the Class Period, FedEx National LTL directly

sold LTL freight transportation services throughout the United States.

22.     Defendant Watkins Motor Lines is a Florida corporation and was, during a

significant portion of the Class Period, a private trucking company with its headquarters located

in Lakeland, Florida. Watkins Motor Lines was purchased by FedEx in September 2006 for

$780 million and is now a wholly owned subsidiary of defendant FedEx. In 2006, Watkins

Motor Lines had revenues from its LTL business in excess of $1 billion. Subsequent to

September 2006, Watkins Motor Lines was "rebranded" as defendant FedEx National LTL.

**Con-Way Freight**

23.   Defendant Con-Way Freight, Inc. is a Delaware corporation with its headquarters located at 10 Parkland Plaza, Ann Arbor, Michigan 48103.  Con-Way Freight is a wholly-owned subsidiary of defendant Con-Way and provides LTL freight transportation services through its regional LTL motor carriers:  Con-Way Freight Western, Con-Way Freight Central, and Con-Way Freight Southern.  Con-Way is believed to be the third largest provider of LTL freight transportation services in the United States with annual revenues just under $3 billion.  In 2006, Con-Way Freight's revenues were about $2.8 billion.  During the Class Period, Con-Way Freight Inc. directly and/or through or under the control of its affiliates sold LTL freight transportation services throughout the United States.

**The UPS Defendants**

24.   Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation with its headquarters located at 55 Glenlake Parkway, NE, Atlanta Georgia 30328.  UPS is an internationally-recognized freight, package delivery and supply chain management company.  On or about August 5, 2005, UPS acquired Overnite Corporation for $1.25 billion and entered the LTL market.  Upon information and belief, UPS assumed Overnite Corporation's liabilities.  UPS is now believed to be the fourth largest LTL freight transportation service provider in the United States.  In 2006, UPS "rebranded" Overnite Corporation as UPS Freight.  UPS Freight's annual revenues for 2006 were in excess of $1.8 billion.  According to the American Trucking Association, UPS Freight is now the fourth largest LTL provider.  During the Class Period, UPS directly and/or through its control of its affiliates, including without limitation its UPS Freight business, sold LTL freight transportation services throughout the United States.

8

25.     Overnite Corporation is a Virginia corporation with its headquarters located at

1000 Semmes Avenue, Richmond, Virginia 23224. During a significant portion of the Class

Period, Overnite was independently operated. Overnite was the fourth largest LTL provider in

2005 with revenues in excess of $1.8 billion. As described above, Overnite is now owned by

defendant UPS and "rebranded" as UPS Freight. During the Class Period, Overnite directly sold

LTL freight transportation services throughout the United States.

**The Arkansas Best Defendants**

26.     Defendant Arkansas Best Corporation is a publicly-traded Delaware corporation

with its headquarters located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

Arkansas Best is trucking conglomerate offering LTL freight transportation services under a

variety of business names and wholly-owned alter-ego subsidiaries, including without limitation,

ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo and

FreightValue, Inc. The Arkansas Best group of companies are believed to be the fifth largest

provider of LTL freight transportation services in the United States. During the Class Period,

Arkansas Best Corporation directly and/or through its control of its affiliates, including without

limitation its wholly-owned subsidiary defendant ABF Freight Systems, Inc., sold LTL freight

transportation services throughout the United States.

27.     Defendant ABF Freight Systems, Inc. is a Delaware corporation with its

headquarters also located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903. ABF

Freight Systems is a wholly-owned subsidiary of defendant Arkansas Best Corporation and,

according to its website, "is one of North America's largest LTL carriers of general

commodities." ABF Freight Systems services all 50 states and in 2006, its revenues exceeded

$1.8 billion. During the Class Period, ABF Freight Systems directly sold LTL freight transportation services throughout the United States.

**Estes Express**

28.    Defendant Estes Express Lines, Inc. is a privately held Virginia corporation with its headquarters located at 3901 West Broad Street, Richmond, Virginia 23230. Estes Express Lines is believed to be the sixth largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.4 billion. Estes Express Lines operates 185 terminals and a fleet of over 29,000 tractors and trailers. During the Class Period, Estes Express Lines directly sold LTL freight transportation services throughout the United States.

**Old Dominion**

29.    Defendant Old Dominion Freight Line, Inc. ("Old Dominion") is publicly-traded Virginia corporation with its headquarters located at 500 Old Dominion Way, Thomasville, North Carolina 27360. Old Dominion is believed to be the seventh largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.1 billion and as described by its website "a leading national less-than-truckload (LTL) carrier providing direct service to 47 states." Old Dominion operates over 4,600 tractors, 13,000 trailers and 188 service centers. During the Class Period, Old Dominion directly sold LTL freight transportation services throughout the United States.

**The SAIA Defendants**

30.    Defendant Saia, Inc. ("Saia") (formerly known as SCS Transportation, Inc.) is a publicly-traded Delaware corporation with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097. Saia provides LTL freight transportation services to about 34 states and operating 148 terminals through its wholly-owned operating subsidiary

Sais Motor Freight Line, LLC. The Saia group of companies is believed to be the eighth largest LTL freight transportation service provider in the United States. According to its website, Saia is a top ten LTL company having achieved most of its growth through mergers and acquisitions. Previously, Saia had been a wholly-owned subsidiary of Yellow Corporation (now known as defendant YRC Worldwide) and became an independent public company on September 30, 2002. On or about June 30, 2006, Saia completed the sale of defendant Jevic Transportation, Inc. to a private investment firm, defendant Sun Capital Partners IV, LLC. During the Class Period, Saia directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Saia Motor Freight Line, LLC, sold LTL freight transportation services throughout about 30 states of the United States in the West, Midwest, Southeast and Southwest regions of the United States.

31.     Defendant Saia Motor Freight Line, LLC is a wholly-owned subsidiary of Defendant Saia, with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097. In 2006, Defendant Saia Motor Freight, LLC reported annual revenues of $874.7 million of which $102.5 million was attributable to the LTL Fuel Surcharges. During the Class Period, defendant Saia Motor Freight Line, LLC directly and/or under the control of its affiliates, including without limitation Defendant Saia, sold LTL freight transportation services throughout a majority of the United States.

32.     Defendants Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation with its headquarters located at 600-700 Creed Road, Delanco, New Jersey 08075. Jevic is a major regional LTL carrier operating in the Northeastern United States, and a hybrid LTL and truckload carrier. Jevic's fleet consists of about 1,400 tractors and 2,400 trailers. Its 2005 revenues were about $350 million. Prior to June 2006, Jevic was owned by defendant SAIA,

Inc. Jevic was sold by Saia to a private investment firm, defendant Sun Capital Partners IV,

LLC. During the Class Period, Jevic directly and/or through its control of its affiliates sold LTL

freight transportation services in the Northeastern United States.

33.     Sun Capital Partners IV, LLC is a private equity fund and Delaware limited

liability company, with its headquarters located at 5200 Town Center Circle, Suite 470, Boca

Raton, Florida 33486. Sun Capital Partners purchased defendant Jervic in or about June of 2006.

During the Class Period, Sun Capital Partners directly and/or through its control of its affiliate

Jervic sold LTL freight transportation services in the Northeastern United States.

**Other Dominant National and Regional LTL Carrier Defendants**

34.     Defendant Averitt Express ("Averitt") is a privately-held Tennessee corporation

with its headquarters located at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee

38502. Averitt provides LTL freight transportation services in about 18 states in the Southeast,

parts of the Southwest, Midwest regions of the United States and through partnerships elsewhere

in North America. Averitt operates a fleet of approximately 4,000 tractors and 11,250 trailers

from a network of about 80 terminals. Averitt's 2006 and 2007 revenues are estimated to be

over $800 million. During the Class Period, Averitt directly sold LTL freight transportation

services throughout the United States.

35.     Defendant R+L Carriers, Inc. ("R+L") is a privately-held Ohio corporation with

its headquarters located at 600 Gilliam Road, Wilmington, Ohio 45177. R+L is a LTL company,

servicing 43 states, operating a fleet of more than 13,000 tractors and trailers, with annual

revenues in 2005 and 2006 of almost $800 million. R+L operates under its own name and under

the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount

12

Transportation. During the Class Period, R+L directly and/or through its control of its affiliates sold LTL freight transportation services in 43 states throughout the United States.

36.     Southeastern Freight Lines, Inc. is a South Carolina corporation with its headquarters located at 420 Davega Road, Lexington, South Carolina 29073. Southeastern Freight Lines is a major regional LTL freight transportation service provider operating in 12 states in the Southeast and parts of the Southwest, with revenues in 2006 exceeded $700 million. During the Class Period, Southeastern Freight Lines directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

37.     AAA Cooper Transportation, Inc. is an Alabama corporation with its headquarters located at 1751 Kinsey Road, Dothan, Alabama. AAA Cooper Transportation is a major regional LTL freight transportation service provider operating in 15 states in the Southeast and parts of the Southwest, with revenues in 2005 and 2006 in excess of $500 million. During the Class Period, AAA Cooper Transportation directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

## CO-CONSPIRATORS AND AGENTS

38.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

39.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

13

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337 and 15 U.S.C. §§15, 26.

41.    Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, (a) defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

42.    This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of LTL sold to purchasers in this district; (b) transacted business in LTL and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district.  Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

### The LTC Fuel Surcharge Conspiracy

43.    Fuel cost is the single substantial variable defendants must cover that is subject to wide variation in price.  When a company's variable costs increase, without a concomitant

offsetting increase in demand, the profits of the company will decrease because the company can only pass on a portion of the cost increase to its customers.

44.     Defendants, facing increased fuel costs and the likelihood of lower profits, have evaded this basic economic law by collusively imposing on their customers what are claimed to be "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs.

45.     Higher fuel costs in fact were merely the pretext and an opportunity for defendants to agree among themselves to impose collusive "fuel surcharges" as a revenue generator.

46.     Fuel surcharges in the LTL industry were instituted in the early to mid 1990s. They initially were met with limited success. Significantly, the fuel surcharges imposed in the early period, unlike those imposed during the conspiracy period, *varied significantly from carrier to carrier*.

47.     The early surcharges were not stated as a percentage of the cost of the base freight, and the carriers were not successful in having them distinguished from base freight rates.

48.     As described in greater detail below, in the earlier years, the industry was not as concentrated as it became by 2003 as the result of mergers of major LTL carriers, as well as the bankruptcy of many smaller LTL providers.

49.     By 2003, the LTL industry had consolidated to the point where collusion on LTL Fuel Surcharges became possible and had become the leading, major means to boost revenue by a process that was shielded from competition.

50.     As one industry analyst, Donald Broughton of A.G. Edwards & Sons, put it, in the early days of unsuccessful fuel surcharges, shippers could "route around those guys [those with

15

the fuel surcharges] and find one who didn't have surcharges. But all those carriers who didn't

ask for fuel surcharges in the early 1990s are gone."

51.     By January 2003, industry analysts noted that LTL Fuel Surcharges that had

failed for 10 years were suddenly successfully imposed by the carriers.

52.     A 2006 article in *Traffic World*, a weekly trade publication covering the

transportation and logistics industry, quoted Ken Hazen, president of transportation software and

freight payment firm CTSI, as describing fuel surcharges as "a profit center now . . . . Carriers

are in control. They're in the catbird seat."

53.     Defendants had been largely unsuccessful in unilaterally implementing LTL Fuel

Surcharges between the early 1990s and 2002 when there was competition among LTL carriers,

however, suddenly in 2003 there was unity and successful implementation.

54.     This sudden "unity" could only have been the result of collusion.

55.     In 2003, defendants departed from their normal business practice of incorporating

fuel costs increases into their basic linehaul costs and began to charge identical or nearly

identical percentages of the base freight rates.

56.     Whereas in the early years of LTL Fuel Surcharges varied significantly from

carrier to carrier, suddenly in 2003 the variations ceased. There could be no explanation for this

change, but collusion and agreement among carriers.

57.     Beginning in 2003, defendants agreed with each other to impose in an identical

manner separate LTL Fuel Surcharges on the invoices submitted to their shipping customers

throughout the United States, rather than incorporate increases in the costs of fuel in the base

freight rates.

58.     Defendants agreed with each other to compute LTL Fuel Surcharges in an identical manner as a percentage of their customers' base rates, which would not correlate to any actual increase in the cost of the fuel, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.

59.     There was no legitimate business justification for this arbitrary means of assessing LTL Fuel Surcharges by percentages unrelated to the actual cost of fuel, other than to enable defendants to match the LTL Fuel Surcharges assessed on the customers of the other carriers and achieve uniformity.

60.     Defendants agreed with each other to use common indices, common timing and common trigger points for adjusting the percentages which constituted the LTL Fuel Surcharges, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.

61.     Defendants agreed to impose identical or nearly identical LTL Fuel Surcharges by agreeing to tie the LTL Fuel Surcharges to an index of diesel fuel prices published to the public by the United States Department of Energy ("Fuel Index").

62.     Defendants agreed with each other to portray the LTL Fuel Surcharges to their shipping customers as necessary to recoup unexpected fuel cost increases.

63.     Defendants agreed with each other to employ LTL Fuel Surcharges as revenue generators and profit centers, and not as a cost-recoupment measure, setting the LTL Fuel Surcharges percentages at levels that resulted in revenues far exceeding the actual cost of fuel increases.

17

64.     Defendants agreed with each other to set the level of LTL Fuel Surcharges at nearly identical percentages of their base freight rates, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.  This action prevented customers from switching carriers in order to avoid the unlawful overcharges on LTL Fuel Surcharges and to pay lower LTL freight transportation costs to another carrier.

65.     Defendants agreed with each other to raise the LTL Fuel Surcharge percentages charged to customers in near lockstep, increasing the percentages charged in lockstep as the price of diesel fuel increased as reported in the U.S. Department of Energy Fuel Index ("Fuel Index"), regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.  This practice prevented customers from switching carriers in order to avoid the unlawful overcharges on LTL Fuel Surcharges and to pay lower LTL freight transportation costs to another carrier.

66.     Defendants agreed with each other to publish their individual LTL Fuel Surcharges on their websites on the internet, serving no apparent purpose for their businesses other than to enable defendants to monitor and enforce the unlawful agreements.

67.     The forbearance of all defendants from charging less than the uniform, inflated LTL Fuel Surcharge in order to gain a competitive advantage and larger share of the market, could only be explained by an agreement to charge identical or nearly identical rates.

68.     As a result of defendants' agreements, defendants' LTL Fuel Surcharges move in virtual lockstep, as illustrated in the following chart showing the fuel surcharges of the major defendants at different Fuel Index levels:

18

| Diesel Fuel $/gal. | Arkan Best | Averitt | Con-Way | FedEx Freight | Jevic | Old Domin. | R+L | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.0% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

69.     Recently the Fuel Index was near $3.00.  At that price, defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 21.0%.

70.     The amount of the LTL Fuel Surcharges imposed by the defendants on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the actual cost or cost increase of the fuel.

### LTL Fuel Surcharges Are Profit Centers

71.     Observers of the LTL industry, and indeed some of the defendants themselves, have noted the direct relationship between high fuel prices and LTL profits.

72.     A transportation industry analyst at Bear Sterns noted that "Our sense is that generally the LTL carriers make money on fuel surcharges and that earnings for LTL providers would be hurt by sustained lower fuel costs."

73.     A 2005 article in *Fleet Owner*, a trade magazine for executives and managers of commercial trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices:

> High diesel fuel prices usually signal harsh times for trucking.. . .
> That doesn't' seem to be the case this year.

74.     Defendant Old Dominion frankly admitted in its 2006 annual report that higher

fuel prices increase its profitability, and lower fuel prices decrease its profitability:

> A rapid and significant decrease in diesel fuel prices would likely
> reduce our revenue and operating income until we revised our
> pricing strategy to reflect these changes.

75.     Defendant YRC also made this admission:

> In general, under our present fuel surcharge program, we believe
> rising fuel costs are beneficial to us in the short term.

76.     The Arkansas Best defendants also made this admission:

> As diesel fuel prices decline, the fuel surcharges and associated
> direct diesel fuel costs also decline by different degrees.
> Depending upon the rates of these declines and the impact on
> costs in other fuel and energy-related areas, operating margins
> could be negatively impacted.

77.     The SAIA defendants also made this admission:

> While fuel costs increased during 2006, higher fuel surcharges
> have more than offset higher diesel costs.

78.     In sum, defendants' imposition of the LTL Fuel Surcharges is not explained as

independent rational decisions to pass on the same rising costs of fuel. Rather, the fuel

surcharges imposed by all defendants are the result of collusive conduct.

### The LTL Market

79.     The "for hire" segment of the trucking industry is composed of "truckload" or

"TL" shipping and "less-than-truckload" or "LTL" shipping. However, the two segments are

vastly different industries. There are approximately 53,000 TL firms in the "TL" freight

transportation market, however, there are less than 1,000 total firms in the LTL freight

transportation market, with the vast majority of those being small companies which could not

begin to meet the needs of the major, national industries dependent on the LTL carrier industry.

80.     Plaintiff and the many thousands of members of the Class purchase LTL freight transportation services as a means to transport freight within the United States by ground.  Based on articles in trucking industry trade journals, plaintiff estimates the annual domestic LTL industry revenue to have ranged from $25 to $45 billion during the Class Period.

81.     In 2006, the total LTL market was estimated at $33.7 billion.  Defendants controlled approximately $25.5 billion of that revenue, or 76% of the LTL market in 2006.

82.     The twelve interrelated defendant groups alleged here to be participants in the conspiracy are all of the national LTL carriers, plus several additional dominant regional carriers, which combined control approximately 76% of the LTL freight transportation market.

### Industry Meetings

83.     Representatives of defendants have regularly met through such organizations as American Trucking Associations, Inc. and the National Motor Freight Traffic Association, Inc. and in addition to the National Classification Committee and the regional "rate bureaus" described below.

84.     Defendants' agreements may have been reached at industry meetings held under the auspices of the National Motor Freight Traffic Association, Inc. ("NMFTA"), based in Alexandria, Virginia, the parent of the National Classification Committee.  The NMFTA is a nonprofit membership organization comprised of more than 1,100 LTL motor carriers.  The following defendants are currently listed as members of the NMFTA on its website:  AAA Cooper, ABF Freight System, Inc., Averitt Express, Con-Way, Estes Express Lines, FedEx Freight, FedEx National LTL, Old Dominion Freight Lines, Roadway Express, UPS Freight and Yellow Transportation, Inc.

85.     The American Trucking Associations, Inc., with a staff of 200, is "the national voice for the trucking industry before Capitol Hill, regulators, the courts and the media" is headquartered in Arlington, Virginia with its "Capital Hill" offices located in Washington, DC. Currently, the Treasurer of the American Trucking Association is the Vice President, Domestic/International of United Parcel Service, Inc. based in Washington, DC and the Secretary is the Chairman, President and CEO of Yellow Roadway Corporation.

### The Conspiracy Was Made Possible By Massive Consolidation

86.     The LTL industry has become increasingly concentrated.  For example, in 2003, defendant YRC, then operating under the name of Yellow, merged with Roadway, then one of its largest LTL competitors.  The combined Yellow/Roadway entity then merged in 2005 with USF, further increasing LTL market concentration.

87.     Following the deregulation of the trucking industry by the Motor Carrier Act of 1980, the following LTL carrier companies and LTL operations of the companies either filed for bankruptcy or were shutdown in the last three decades:

### *1980s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| Admiral-Merchants Motor Freight Inc. | St. Paul MN | early 1980s |
| American Freight System | Overland Park KS | 1988 |
| Bender & Loudon Motor Freight | Akron OH | 1989 |
| Blue Line Express | Nashua NH | 1989 |
| Boss-Linco Lines Inc. | Buffalo NY | 1982 |
| Branch Motor Express | New York NY | 1984 |
| Brigg's Transportation | St. Paul MN | 1984 |
| Brown Express Inc | San Antonio, TX | 1988 |
| Campbell's 66 Express Inc | Springfield MO | 1986 |
| Central Transport | Sterling Heights MI | 1983 |
| Central Truck Lines Inc. | Tampa FL | 1989 |
| Chippewa Motor Freight Inc. | Eau Claire WI | 1980 |
| Clairmont Transfer Co. | Escanaba MI | 1985 |
| Cleveland, Columbus, & Cincinnati Highway Inc. | Cleveland OH | 1988 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Commercial-Lovelace Motor Freight | Columbus OH | 1985 |
| Cooper-Jarrett Motor Freight Lines Inc. | Orange NJ | 1981 |
| C.W. Transport Inc. | Wisconsin Rapids WI | 1988 |
| Davidson Transfer & Storage Co. | Baltimore, MD | 1983 |
| Eazor Express | Pittsburgh PA | 1983 |
| Gateway Transportation | La Crosse WI | 1983 |
| Glendenning Motorways Inc. | St. Paul MN | 1983 |
| Gordon's Transports Inc | Memphis TN | 1983 |
| Gross Common Carriers | unknown | late 1980s |
| Hall's Motor Transit Co. | Harrisburg PA | 1986 |
| Hannibal-Quincy Truck Lines Inc. | Quincy IL | 1983 |
| Hemingway Transportation | New Bedford MA | 1982 |
| Holmes Route USA | Framingham MA | 1989 |
| Horn's Motor Express Inc. | Chambersburg PA | 1989 |
| Illinois-California Express (ICX) | Denver CO | 1984 |
| IML Freight Inc | Salt Lake City UT | 1984 |
| Intercity Transportation | Easton MA | 1980 |
| Interstate Motor Freight System | Grand Rapids MI | 1984 |
| Johnson Motor Lines | Charlotte NC | 1980 |
| Jones Motor Co Inc | Spring City PA | 1981 |
| Lee Way Motor Freight Inc. | Oklahoma City OK | 1985 |
| Maislin Brothers Transport Ltd. | La Salle, Quebec | 1983 |
| Mason & Dixon Lines Inc | Kingsport TN | 1984 |
| McLean Trucking Co. | Winston-Salem NC | 1986 |
| Milne Truck Lines Inc | Salt Lake City UT | 1987 |
| Motor Freight Express System | York PA | 1982 |
| Murphy Motor Freight Lines Inc. | St. Paul MN | 1987 |
| Mushroom Transportation | Philadelphia PA | 1986 |
| Oneida Motor Freight Inc. | Carlstadt NJ | 1985 |
| Pilot Freight Carriers Inc. | Winston-Salem NC | 1989 |
| Quinn Freight Lines | Brocton MA | 1983 |
| Richmond Cartage Inc. | unknown | 1983 |
| Rimes Trucking Co. | Chardon OH | early80s |
| Ringsby Truck Lines Inc. | Denver CO | 1984 |
| Smith's Transfer Corp. | Staunton VA | 1988 |
| Spector-Red Ball | Dallas TX | 1982 |
| Sterling Transit Company Inc. | Montebello CA | 1989 |
| Suburban Motor Freight Inc. | Columbus OH | 1987 |
| System 99 | Oakland CA | 1987 |
| Taynton's Freight System Inc. | Wellsboro PA | 1985 |
| T.I.M.E.-D.C. Inc. | Lubbock TX | 1988 |
| Tose-Fowler Inc. | Bridgeport PA | 1989 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Transport Motor Express Inc. | Ft. Wayne IN | 1980 |
| Tucker Freight Lines | South Bend IN | 1983 |
| Wilson Freight Co. | Cincinnati OH | 1980 |

## *1990s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| AAA | Trenton NJ | 1990 |
| Allegheny Freight Lines | Winchester VA | 1990 |
| ANR Advance Transportation Co. | Milwaukee WI | 1998 |
| Arrow Carrier Corp | North Bergen NJ | 1990 |
| Atlanta Motor Lines | Conley GA | 1997 |
| Bee Line Motor Freight Co. | Omaha NE | 1996 |
| Be-Mac Transport Co | St. Louis MO | 1992 |
| Birmingham Nashville Express | unknown | 1996 |
| Bowman Transportation | Gadsden AL/Atlanta GA | 1990 |
| Brown Transport Corp. | Atlanta GA/Charlotte NC | 1990 |
| Central Storage & Transfer Co. | Harrisburg PA | 1991 |
| Charlton Brothers | Hagerstown MD | 1996 |
| Churchill Truck Lines Inc | Chillicothe MO | 1994 |
| Coles Express Inc. | Bangor ME | 1997 |
| Commercial Motor Freight Inc. of IN | Indianapolis IN | 1983 |
| Edson Express | Casper WY/Denver CO | 1991 |
| Fore-Way Express Inc. | Wausau WI | 1996 |
| Friedman's Express | Wilkes-Barre PA | 1993 |
| Holmes Freight Lines | Omaha NE | 1998 |
| Hover Trucking Co. | South Bend IN | 1996 |
| Hyman Freightways Inc. | St. Paul MN | 1997 |
| Ideal Truck Lines | Norton KS | 1996 |
| Inter-City Truck Lines | Mississauga, Ontario | 1993 |
| Interlink Freight Systems | Toronto, Ontario | 1997 |
| Jones Truck Lines Inc. | Springdale AR | 1991 |
| Merchants Fast Motor Lines Inc | Abilene TX | 1997 |
| Middlewest Freightways Inc. | St. Louis MO | 1992 |
| Motorways Ltd | Toronto, Ontario | 1993 |
| Nationsway Transport Services | Commerce City CO | 1999 |
| North Penn Transfer | Lansdale PA | 1992 |
| Penn Yan Express | Penn Yan NY | 1990 |
| P.I.E. Nationwide Inc | Jacksonville FL | 1990 |
| Preston Trucking Inc. | Preston MD | 1999 |
| Spartan Express Inc. | Greer SC | 1997 |
| Standard Trucking Co. | Charlotte NC | 1993 |
| St. Johnsbury Trucking Co Inc. | St. Johnsbury VT | 1993 |
| Transcon Lines | Los Angeles CA | 1990 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Riss & Co. Inc | Kansas City MO | 1990 |
| Willig Freight Lines | San Francisco CA | 1995 |

### *2000s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| A-P-A Transport Corp | North Bergen NJ | 2002 |
| Alterman Transport Lines | Opa-Locka, FL | 2003 |
| Consolidated Freightways Corp. | Vancouver WA | 2002 |
| Crescent Truck Lines | Haywood CA | 2003 |
| Crouse Cartage Co. | Carroll IA | 2000 |
| Guaranteed Overnite Delivery | unknown | 2004 |
| H&W Motor Express | Dubuque IA | 2002 |
| K&R Express Systems | Blue Ridge IL | 2004 |
| Nussbaum Trucking | Normal IL | 2002 |
| Parker Motor Freight | Grand Rapids MI | 2004 |
| Rudolf Express | Bourbonnais IL | 2002 |
| USF Red Star | Newark NJ | 2004 |

88.     Of the 60 leading LTL industry participants in operation in 1983, very few were left by 2003 and just six were left in 2006.

### Other Structural Characteristics of the Industry

89.     A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of the horizontal price-fixing conspiracy alleged herein.

a       LTL freight transportation is a commodity service. One defendants' LTL freight transportation service is substitutable for another's. Defendants sell and plaintiff (and members of the Class) purchases LTL freight transportation services primarily on the basis of price.

b       Demand for LTL freight transportation services is inelastic. Accordingly, the gains from collusion are substantial.

c       The LTL industry in the United States is highly concentrated, facilitating coordination of prices. During the Class Period, defendants' combined United States market share exceeded 75%.

25

d       There are substantial barriers to entry in the LTL industry requiring substantial time, resources and industry knowledge to even potentially overcome. Viable entry requires the purchase or lease of hundreds of trucks and dozens of truck depots or terminals. Similarly, viable entry requires that a new provider capture a significant market share from existing providers. Thus, entry is both expensive and risky. Entry is further restricted by the tight labor market for truck drivers.

e       Even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry takes a long time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded existing LTL companies rather than attempting to enter the market directly.

f       LTL freight transportation is a nondurable service. Unlike some industries, shippers cannot "stock up" on LTL freight shipments when prices are low and use this stockpile when shipping prices are high.

g       Defendants all sell at the retail level of distribution as horizontal competitors.

h       Price is the most important competitive factor in LTL shipping, and the standardized nature of the LTL shipping services hinders substantial and material non-price competition.

i       Newer industries are typically characterized by rapid growth, innovation, and high profits. The LTL industry is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

j       The industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies, under the claimed

purpose of allowing nationwide service, but in fact with many more companies than would be required to offer such services. The level of cooperation within the trucking industry is conducive to the type of unlawful collusion alleged herein.

        k      Defendants' publication of prices facilitated monitoring against cheating on the unlawful agreement to impose supra-competitive LTL Fuel Surcharges.

### The Collusive Use and Setting of LTL Fuel Surcharges Alleged Here Was Not Approved by the STB or Immunized from the Antitrust Laws

90.     Between 1933 and 1980, the motor carrier industry was subject to pervasive regulation. In 1948, Congress passed the Reed-Bullwinkle Act (Pub. L. No. 80-662, 62 Stat. 472) (1948) which allowed rate-bureaus operating under the Interstate Commerce Commission-approved agreements to set rates collectively, and immunized the activities of bureaus operating under such an agreement.

91.     The first phase of deregulation occurred in 1980 when Congress passed the 1980 Motor Carrier Act (Pub. L. No. 96-296, 94 Stat. 293 (1980) in which Congress essentially repealed interstate motor carrier regulation in order to promote competition. The interstate highway system had been built and trucks, rather than railroads, came to dominate the carriage of manufacturer goods. The motor carrier industry achieved financial stability and the original rationale for restrictive motor carrier regulation ceased to exist. The Act curtailed the permissible activities of rate bureaus and prohibited the bureaus or their members from interfering with any carrier's right to publish its own rates.

92.     The motor carrier industry was further deregulated in 1994 by the Trucking Industry Regulatory Reform Act (Pub. L. No. 103-311, 108 Stat. 1583 (1994), when Congress removed the requirement that motor carriers of general freight file tariffs.

93.     In 1995, the ICC Termination Act of 1995 (Pub. L. No. 104-88, 109 Stat. 803

(1995) eliminated regulation of motor carrier rates altogether, except for rates for household

goods and certain rates collectively set by the motor carrier rate bureaus, and which were subject

to review and approval by the Surface Transportation Board ("STB").

94.     Every five years the STB completes its review, pursuant to 49 U.S.C. 13703(c), of

the agreements of motor carriers rate bureaus to engage in rate-related collective activities.

95.     After the 1995 deregulation, the rate bureaus, including the National

Classification Committee and the regional rate bureaus – the Middlewest Motor Freight Bureau,

the Rocky Mountain Tariff Bureau, the Southern Motor Carriers Rate Conference, Inc. and the

New England Motor Rate Bureau – continued to exist.  The bureaus established "class rates"

based on a classification system and computed general rate increases.

96.     The activities of the STB-approved rate bureaus to set class rates and compute

general rate increases have had limited immunity from the antitrust laws.  However,

notwithstanding this limited immunity, even motor carriers participating in the motor carrier rate

bureaus have not had immunity to agree on the actual rates they will charge.

97.     The limited immunity given, until recently to the National Classification

Committee and the regional rate bureaus, did not and does not apply to the conduct challenged in

this case.

98.     Following the passage of the ICC Termination Act of 1995, "class rates" have

been used only as "benchmarks" or "baseline prices."  *See* Surface Transportation Board

Decision, STB Ex Parte No. 656 "Motor Carrier Bureaus – Periodic Review Proceeding" and

"Investigation into the Practices of the National Classification System," decided May 4, 2007

and service date May 7, 2007 ("STB Decision") attached as Exhibit A at 16.

99.     The motor carriers participating in the motor carrier rate bureaus have not had immunity to agree on the actual rates they will charge.  Title 49 U.S.C. Subtitle IV Part B Chapter 137 and 147 governs trucking today and 49 U.S.C. § 13703(a)(1)(G) provides that "rate adjustments of general application based on industry average carrier costs (so long as there is no discussion of individual markets or particular single-line rates)…"

100.     The National Motor Freight Traffic Association, Inc., headquartered in Alexandria, Virginia is a nonprofit membership organization comprised of more than 1,100 LTL motor carriers which develops and maintains the National Motor Freight Classification. Although the association describes the classification as a "pricing tool," its website states that "[c]lassification is not ratemaking and does not set freight charges."

101.     The carriers, especially the large carriers, set their rates individually according to their own costs and market conditions and publish their own rates.  The carriers that do continue to use a class rate system usually apply significant discounts, and the "class rates" serve as baseline rates only. *See* STB Decision at 3.  Therefore, no antitrust immunity can be applicable to the rates set or charged by these companies or the LTL Fuel Surcharges at issue in this case.

102.     On May 7, 2007, the STB took the final step in deregulation and terminated its approval of the National Classification Committee and the regional rate bureaus entirely effective January 1, 2008 and any remaining limited antitrust immunity for the bureaus, finding that the bureaus were not in the public interest and had exposed shippers to "artificially inflated rates that result from collective ratemaking…". *Id.* at 15-16; as amended 2007 WL 1852195 (S.T.B. June 27, 2007).

## ANTITRUST INJURY

103.    The unlawful contract, combination or conspiracy alleged above had and is having, *inter alia*, the following effects:

a       Prices charged by defendants and their co-conspirators to plaintiff and the members of Class for LTL freight transportation services and LTL Fuel Surcharges were maintained at artificially high and noncompetitive levels;

b       Plaintiff and members of the Class were required to pay more for LTL freight transportation services and LTL Fuel Surcharges than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c       Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for LTL freight transportation.

104.    During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased LTL freight transportation services and paid LTL Fuel Surcharges in the United States.

105.    Plaintiff and the other Class members paid more for the LTL freight transportation services and LTL Freight Surcharges than they would have paid under conditions of free and open competition.

106.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damages in their businesses and property, in amounts that are not presently determined.

107.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in the proceeding paragraphs of this Complaint.

109.    Plaintiff brings this action on behalf of itself and the members of the Class

comprising:

> All persons or entities which purchased LTL freight
> transportation services and paid a LTL Fuel Surcharge
> directly to defendants or their unnamed co-conspirators
> from June 15, 2003 to the present.  Excluded from the
> Class are federal entities, defendants, their co-conspirators
> and their representatives, parents, subsidiaries and
> affiliates.

110.    Plaintiff brings this action on its own behalf and as a class action under Rule

23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of

the Class.

111.    Due to the nature of the trade and commerce involved, plaintiff believes the Class

numbers in the thousands, the exact number and identities being known only by defendants.

112.    The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

113.    Class members are identifiable from information and records in the possession of

defendants.

114.    There are questions of law and fact common to the Class.  These common

questions relate to the existence of the conspiracy alleged, and to the type and common patter of

injury sustained as a result thereof.  The question includes but are not limited to:

a       Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize LTL Fuel Surcharges imposed for LTL freight transportation services sold in the United States;

b       The identity of participants in the conspiracy;

c       The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in the furtherance of the conspiracy;

d       Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e       Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f       The effect of defendants' conspiracy on the prices of LTL freight transportation sold in the United States during the Class Period; and

g       The appropriate measure of damages sustained by plaintiff and other members of the Class.

115.    Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff paid LTL Fuel Surcharges for LTL freight transportation services directly to one or more of defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.  In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

116.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

117.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

118.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common  claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

119.    The conduct of defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*:

a       Defendants and their co-conspirators have sold and provided LTL freight transportation services which imposed LTL Fuel Surcharges throughout the United States;

b        Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell and provide LTL freight transportation services which imposed LTL Fuel Surcharges throughout the United States;

c        In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications; and

d        The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

**CLAIM FOR RELIEF**
**for Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act**

120.    Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

121.    From a date unknown, but beginning at least as early as June 15, 2003, and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

122.    In furtherance of the unlawful conspiracy, upon information and belief, each of defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a        agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of LTL Fuel Surcharges imposed on LTL freight transportation services sold in the United States;

b        communicating with co-conspirators regarding prices to be charged for LTL Fuel Surcharges;

34

     c     meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

     d     refraining from competing by refusing to offer LTL Fuel Surcharges and LTL freight transportation services at prices below the agreed-upon fixed price.

123.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of LTL Fuel Surcharges imposed on LTL freight transportation services.

124.    Defendants' anti-competitive agreement was implemented by, *inter alia*, instituting LTL Fuel Surcharges calculated by reference to publicly published indices. These coordinated price increases continued on a regular basis through the present, with the actual and intended result that plaintiff and members of the Class paid supracompetitive prices for fuel surcharges on LTL freight transportation services. Defendants falsely attributed these price increases to the cost of fuel. As a direct and proximate result of the LTL Fuel Surcharges price-fixing conspiracy, defendants have restrained competition in the LTL freight transportation services market and injured plaintiff and each Class member in their business and property in that they have each paid a higher price for LTL Fuel Surcharges and LTL freight transportation services than they would have paid absent the concerted unlawful activity.

125.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

126.    The conduct of defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, plaintiff petitions that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the Class.

B.      The contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

a.      Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

b.      Communicating or causing to be communicated to any other person engaged in manufacture, distribution or sale of LTL freight transportation services except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

36

E.     Plaintiff and members of the Class have such other, further and different relief as

the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial of all issues triable by jury.

Dated:  October 1₹, 2007.

Respectfully submitted,

**BOIES, SCHILLER & FLEXNER LLP**

By:  _____

Richard B. Drubel, Jr. (D.C. Bar No. 334359)
Tanya Chutkan (D.C. Bar No. 420478
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727
Fax:  (202) 237-6131
E mail:  rdrubel@bsfllp.com
         tchutkan@bsfllp.com

Steven N. Williams
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road
Burlingame, CA 94010
Telephone:  (650) 697-6000
Fax:  (650) 697-0577
E mail:  swilliams@cpmlegal.com

Richard L. Coffman
**THE COFFMAN LAW FIRM**
505 Orleans Street, Suite 505
Beaumont, TX 77701
Telephone:  (409) 833-7700
Fax:  (866) 835-8250
E mail:  rc@cofflaw.com

John L. Jernigan, III
Alabama Bar No.: ASB-7373-E62J
Edward L. McMillan, IV
Alabama Bar No.: ASB-1010-D66M

**JERNIGAN & MCMILLAN, P.C.**
319 Belleville Avenue
P.O. Box 828
Brewton, AL 36427
Telephone:  (251) 809-2981
Fax:  (251) 809-2980
E mail:  Johnjernigan901@bellsouth.net